# In the United States Court of Federal Claims

**No. 15-1443C**
**Filed: May 9, 2017**

```
* * * * * * * * * * * * * * * * * *    *
                                       *
GAZPROMNEFT-AERO                       *
KYRGYZSTAN LLC,                        *
                                       *
              Plaintiff,               *    Summary Judgment; Breach of
                                       *    Contract; FAR 52.229-6; Notice;
       v.                              *    Prejudice; International Agreements.
                                       *
UNITED STATES,                         *
                                       *
              Defendant.               *
                                       *
* * * * * * * * * * * * * * * * * *    *
```

 **Brad Fagg**, Morgan, Lewis & Bockius, LLP, Washington, D.C for the plaintiff. Of counsel was **Grant W. Eskelsen**, Morgan, Lewis & Bockius, LLP, Washington, D.C.

 **Igor Helman**, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. With him were **Steven J. Gillingham**, Assistant Director, Commercial Litigation Branch, **Robert E. Kirschman, Jr.**, Director, Commercial Litigation Branch, and **Chad A. Readler,** Acting Assistant Attorney General, Civil Division, Department of Justice. Of counsel were **Howard M. Kaufer**, Supply Chain Counsel, and **Kathryn M. Kelley**, Assistant Counsel, Defense Logistics Agency, DLA Counsel-Energy, Ft. Belvoir, VA.

## O P I N I O N

<u>HORN, J.</u>

 In the above-captioned case, plaintiff Gazpromneft-Aero Kyrgyzstan LLC (GPNA-K), a limited liability corporation formed under the laws of the Kyrgyz Republic, with its principal place of business in the Kyrgyz Republic, alleges breach of contract by defendant United States, acting through the Defense Logistics Agency Energy (DLA Energy). At issue are contract claims under two contracts between GPNA-K and DLA Energy executed on September 26, 2011 and March 15, 2013 to supply jet fuel to DLA Energy at the Transit Center at the Manas International Airport (the Manas Transit Center) in the Kyrgyz Republic, in support of United States Department of Defense military operations in Afghanistan and the surrounding region. GPNA-K alleges that DLA Energy breached these contracts when DLA Energy failed to adjust its payments to GPNA-K after the Kyrgyz Republic imposed certain back taxes on GPNA-K, as GPNA-K alleges DLA Energy was required to do, based on a combination of the language in the contracts at issue and a 2009 international agreement between the United States and the Kyrgyz Republic.

**FINDINGS OF FACT**

The governments of the United States and Kyrgyz Republic entered into the international agreement at issue, the Agreement for Cooperation between the Government of the United States of America and the Government of the Kyrgyz Republic (the Cooperation Agreement), on May 13, 2009. The stated purpose of the Cooperation Agreement was to "address issues related to United States Department of Defense personnel . . . present in the territory of the Kyrgyz Republic in connection with cooperative efforts in response to terrorism, humanitarian assistance, providing assistance to the Government of Afghanistan in the area of security, and other mutually agreed activities." Among other items, the Cooperation Agreement limited the tax liability of United States contractors in Kyrgyzstan, with Article 4 of the Agreement stating:

> The United States Department of Defense, its personnel, contractors and contractor personnel shall not be liable to pay any tax or similar charge assessed within the territory of the Kyrgyz Republic, except that contractors and contractor personnel normally resident in the territory of the Kyrgyz Republic shall only be exempt from any tax or similar charge assessed within the Kyrgyz Republic in connection with activities under this Agreement.

Similarly, a different provision of the Cooperation Agreement, Article 7 stated:

> In the event that the Government of the United States of America awards contracts for the acquisition of articles and services, including construction, to implement this agreement, such contracts shall be awarded in accordance with the laws and regulations of the Government of the United States of America. Acquisition of articles and services in the Kyrgyz Republic by or on behalf of the Government of the United States of America in implementing this agreement shall not be subject to any taxes, customs duties or similar charges in the territory of the Kyrgyz Republic.

The United States and the Kyrgyz Republic subsequently signed two additional agreements implementing the Cooperation Agreement. The first, signed May 13, 2009, was the Agreement Between the Government of the United States of America and the Government of the Kyrgyz Republic Regarding the Transit Center at Manas International Airport and Any Related Facilities/Real Estate (the Manas Transit Center Agreement). Among other issues, the Manas Transit Center Agreement addressed, and provided for, reimbursement by the United States to the Kyrgyz Republic for certain support services consistent with the Cooperation Agreement, and also for access and use of the Manas Transit Center by United States armed forces personnel, Department of Defense contractors, contractor personnel, and equipment.

The second agreement, signed February 8, 2011, was the Agreement Between the Government of the Kyrgyz Republic and the Government of the United States of America Regarding Acquisition of Fuel for Operations at the Transit Center (the Manas

Fuel Agreement). The Manas Fuel Agreement stated that it was being entered into "[r]ecognizing" the Cooperation Agreement and the Manas Transit Agreement, and "[d]esiring to provide specifically for the acquisition of some portion of U.S. Government fuel requirements from an entity or entities designated by the KR [Kyrgyz Republic] Government." In pursuit of these goals, the Manas Fuel Agreement provided that the respective governments would "reserve a mutually agreed portion of the requirements of the United States for fuel and for related services at the Transit Center at Manas International Airport for supply by an entity or entities designated by the KR Government and approved by U.S. Government contracting representatives." Through an order dated April 18, 2011, the Prime Minister of the Kyrgyz Republic designated GPNA-K as a supplier of aviation fuel at the Manas Transit Center, pursuant to the Manas Fuel Agreement.

On April 26, 2011, DLA Energy issued a request for proposals to supply jet fuel to the Manas Transit Center. On September 26, 2011, DLA Energy awarded the first of two contracts to GPNA-K to supply jet fuel to the Manas Transit Center (the 2011 Contract). The 2011 Contract contained the full text of the June 2003 version of the Federal Acquisition Regulation (FAR) clause regarding taxes for foreign, fixed price contracts, FAR § 52.229-6, which states, in relevant part:

> (c) Unless otherwise provided in this contract, the contract price includes all applicable taxes and duties, except taxes and duties that the Government of the of the United States and the government of the country concerned have agreed shall not be applicable to expenditures in such country by or on behalf of the United States.

> (d) The contract prices shall be increased by the amount of any after-imposed tax or of any tax or duty specifically excluded from the contract price by a provision of this contract that the Contractor is required to pay or bear, including any interest or penalty, if the Contractor states in writing that the contract price does not include any contingency for such tax and if liability for such tax, interest, or penalty was not incurred through the Contractor's fault, negligence or failure to follow instructions for the Contracting officer or to comply with the provision of paragraph (i) below.

> * * *

> (i) The Contractor shall take all reasonable action to obtain exemption from or refund of any taxes or duties, including interest or penalty, from which the United States Government, the Contractor, any subcontractor, or the transactions or property covered by this contract are exempt under the laws of the country concerned or its political subdivisions or which the governments of the United States and of the country concerned have agreed shall not be applicable to expenditures in such country by or on behalf of the United States.

(j) The Contractor shall promptly notify the Contracting Officer of all matters relating to taxes or duties that reasonably may be expected to result in either an increase or decrease in the contract price and shall take appropriate action as the Contracting Officer directs. The contract price shall be equitably adjusted to cover the costs of action taken by the Contractor at the direction of the Contracting Officer, including any interest, penalty, and reasonable attorneys' fees.

FAR § 52.229-6 (June 2003).[1] Also relevant to the present case are two definitions from FAR § 52.229-6 similarly included in the 2011 Contract:

"After-imposed tax" means any new or increased tax or duty, or tax that was exempted or excluded on the contract date but whose exemption was later revoked or reduced during the contract period, other than excepted tax, on the transactions or property covered by this contract that the Contractor is required to pay or bear as the result of legislative, judicial, or administrative action taking effect after the contract date.

"Excepted tax" means social security or other employment taxes, net income and franchise taxes, excess profits taxes, capital stock taxes, transportation taxes, unemployment compensation taxes, and property taxes. "Excepted tax" does not include gross income taxes levied on or measured by sales or receipts from sales, property taxes assessed on completed supplies covered by this contract, or any tax assessed on the Contractor's possession of, interest in, or use of property, title to which is in the U.S. Government.

FAR § 52.229-6(b) (June 2003). A second contract between DLA Energy and GPNA-K, which was a follow-on contract to the 2011 Contract, was executed on March 15, 2013 (the 2013 Contract). The 2013 Contract contained the same language from the 2003 version of FAR § 52.229-6 as the 2011 Contract. GPNA-K ultimately did deliver fuel under the 2011 and 2013 Contracts to United States forces at the Manas Transit Center.

During the negotiations for the 2011 Contract, the parties exchanged emails on various matters, which were then explicitly incorporated by reference into the 2011 and 2013 contracts. Among the emails incorporated in the 2011 and 2013 Contracts was a July 15, 2011 email from GPNA-K to DLA Energy stating:

Price of jet fuel announced by LLC "Gazpromneft-Aero Kyrgyzstan" is final. Any other additional payments will not be imposed. Price of jet fuel dedicated to MTC [Manas Transit Center] does not include any taxes, duties

---

[1] The same language is contained in the most recent version of FAR § 52.229-6, except paragraphs (c) and (d) have been renumbered (c)(1) and (d)(1), respectively, and certain exceptions to these paragraphs have been added in new paragraphs (c)(2) and (d)(2). See FAR § 52.229-6 (2017).

and fees of the Kyrgyz Republic according [to] terms of agreement between governments of Kyrgyz Republic and USA.

A summary of this email, quoting the language identified, also was included in the negotiation discussion record prepared by DLA Energy on July 18, 2011 and emailed to GPNA-K on July 22, 2011.

On October 31, 2011, GPNA-K sent a letter to the Kyrgyz Tax Service requesting an official opinion verifying that its use of certain accounting methodologies for taxable and tax-exempt deliveries was proper in light of the tax exemptions contained in the Cooperation Agreement. GPNA-K received a negative response from the Kyrgyz Tax Service on November 24, 2011, which, as paraphrased by GPNA-K in a letter of its own to the Kyrgyz Ministry of Foreign affairs, dated June 29, 2012,[2] stated:

> on the basis of section 3 of the Rules on the Implementation of International Treaties and Other Agreements to which the Kyrgyz Republic is a Party, regarding exemptions from the payment of taxes, duties, and other payments, adopted by Resolution No. 155 of the Government of the Kyrgyz Republic, dated April 12, 2011, there is no right to an exemption from the payment of income tax, profit tax, and the tax on the income of non-residents, which shall be paid in the general manner.

In its June 29, 2012 letter to the Ministry of Foreign Affairs, GPNA-K challenged the Kyrgyz Tax Service's interpretation, arguing that it was contradictory to the provisions of the laws and Constitution of the Kyrgyz Republic regarding the interpretation of international treaties such as the Cooperation Agreement.

On June 20, 2012, the Kyrgyz Tax Service issued an order authorizing an audit of GPNA-K for compliance with the tax laws of the Kyrgyz Republic with regard to fuel sales in 2011 and the first quarter of 2012. In connection with the audit, GPNA-K sought and received several favorable official determinations from other branches of the government of the Kyrgyz Republic. In particular, on July 3, 2012, the Deputy Minister of Foreign Affairs wrote a letter to GPNA-K confirming that if GPNA-K "is a contractor in accordance with the [Cooperation] Agreement, then the provisions of articles 4 and 7 of the Agreement shall be applied in relation to [GPNA-K]." Similarly, on July 24, 2012, the Minister of Economy and Antimonopoly Policy wrote a letter confirming that, with respect to sales of aviation fuel to the United States government at the Manas Transit Center, GPNA-K "will be exempted from payment of any taxes including profit tax, with the exception of income tax and tax on the income of non-residents." Additionally, a letter from the Prime Minister to the President of the Kyrgyz Republic, dated August 8, 2012 and transmitted to GPNA-K on August 10, 2012, noted the applicability of the Cooperation Agreement and that taxation of GPNA-K "should take place in accordance with the above-mentioned

---

[2] The actual response by the Kyrgyz Tax Service was not included in the record supplied by the parties to this court. The parties have, however, stipulated that the language included in GPNA-K's letter to the Kyrgyz Ministry of Foreign Affairs "paraphrased" the Kyrgyz Tax Service's November 24, 2011 response to GPNA-K.

[Cooperation] Agreement." Despite these favorable statements, on August 7, 2012, the Kyrgyz Tax Service issued a decision finding, among other determinations, that, under Kyrgyz law, GPNA-K owed back "profits" taxes, in the amount of 10% of calculated net sales, for the sale of jet fuel to DLA Energy, as well as penalties.

GPNA-K challenged the Kyrgyz Tax Service's findings, filing an appeal with the Kyrgyz Tax Service on September 24, 2012. GPNA-K also commenced legal proceedings under the Kyrgyz legal system, filing a claim with the first level of the Kyrgyz court system on January 10, 2013, an appeal with an intermediate Kyrgyz court on December 13, 2013, and an appeal with the highest Kyrgyz court, the Kyrgyz Supreme Court, on June 26, 2014. On June 25, 2014, after the ruling of the intermediate Kyrgyz court, and while the appeal to the Kyrgyz Supreme court was being pursued by GPNA-K, GPNA-K paid the amounts of back profits taxes and penalties calculated by the Kyrgyz Tax Service for 2011 and the first quarter of 2012, pursuant to an order from the Kyrgyz Tax Service. Ultimately, with respect to the Kyrgyz Tax Service's assessment of profits taxes on GPNA-K for 2011 and the first quarter of 2012, each of the Kyrgyz courts ruled against GPNA-K, with the Kyrgyz Supreme Court's decision issued November 6, 2014. The Kyrgyz Supreme Court's decision affirming the decisions of the Kyrgyz Tax Service and the lower courts stated that the Kyrgyz Supreme Court's decision was "binding and not subject to dispute."

While GPNA-K's claim regarding its 2011 and first quarter of 2012 tax assessments, proceeded through the Kyrgyz legal system, on June 26, 2013, the Parliament of the Kyrgyz Republic promulgated a law stating that the Cooperation Agreement "shall be denounced," effective July 11, 2014. On February 18 and 19, 2014, GPNA-K sent two emails to DLA Energy regarding the effect of the termination of the Cooperation Agreement on its offer for a possible third supply contract. This third agreement was never consummated. In early June 2014, the United States handed over control of the Manas Transit Center to the Kyrgyz Republic. The last sales made by GPNA-K to DLA Energy under the 2011 and 2013 Contracts occurred during the first quarter of 2014 prior to the June 2014 handover.

On June 24, 2014 the Kyrgyz Tax Service issued a second finding assessing additional profit taxes on fuel sales by GPNA-K at the Manas Transit Center for the last three quarters of 2012, the entirety of 2013, and the first quarter of 2014. On June 30, 2014, GPNA-K wrote a letter to the then-DLA Contracting Officer Jonathan Moore asking him: (1) to confirm that GPNA-K was a contractor of DLA Energy based on the 2011 and 2013 Contracts; (2) to confirm that activities under the 2011 and 2013 Contracts were exempt from "all taxes" in the Kyrgyz Republic pursuant to the Cooperation Agreement; and (3) to provide an explanation of the term "all taxes and duties" under FAR § 52.229-6 and whether the "definition exempts from income tax." The letter, however, made no mention of GPNA-K's tax issues with the Kyrgyz Tax Service or the related litigation. By letter dated July 2, 2014, Mr. Moore responded, confirming that GPNA-K was a DLA Energy Contractor, but, regarding GPNA-K's second and third questions, stating:

> We cannot state that the clause [FAR § 52.229-6] applies to income taxes because Paragraph (b) of the clause states that "excepted taxes" do not include certain taxes, including "gross income taxes levied on or measured

by sales or receipts from sales[.]" In addition, DLA Energy cannot advise Gazpromneft-Aero Kyrgyzstan whether it is exempt from paying specific Kyrgyz taxes under the Agreement for Cooperation.

(alteration in original).

On August 14, 2014, the Kyrgyz Tax Service issued an inspection report summarizing its findings that GPNA-K allegedly owed back profits taxes for calendar years 2012 and 2013. GPNA-K challenged the assessment of those 2012 and 2013 taxes, first through the administrative process of the Kyrgyz Tax Service in September 2014 and then in the Kyrgyz courts in December 2014. Counsel for GPNA-K sent a letter to DLA Energy's Mr. Moore, dated October 20, 2014, informing him that GPNA-K had been audited and assessed back taxes for the years 2011-2013 by the Kyrgyz Tax Service for sales made pursuant to the 2011 and 2013 Contracts, as well of the related Kyrgyz legal proceedings, and stating that, "to the extent that appeal of the assessments to Kyrgyzstan's Supreme Court is unsuccessful," GPNA-K believed it was entitled to a price adjustment of the 2011 and 2013 Contracts under FAR § 52.229-6. The parties have stipulated that this letter, dated October 20, 2014, is the earliest document in the record of any communications from GPNA-K to DLA Energy regarding the audits and assessments of the Kyrgyz Tax Service, as well as the related legal proceedings. Mr. Moore, however, had left DLA Energy at some point prior to October 20, 2014. Counsel for GPNA-K wrote a second letter to Mr. Moore regarding its tax issues, which, the parties have stipulated, was delivered to the new DLA Energy contracting officer, Mr. Jamaal Rose, on or about March 27, 2015. The parties have stipulated that, on May 8, 2015, DLA Energy informed counsel for GPNA-K that DLA Energy had no record of having received the October 20, 2014 letter. The parties also have stipulated that, on May 11, 2015, GPNA-K's counsel forwarded the October 20, 2014 letter to DLA Energy.

On June 22, 2015, GPNA-K filed a certified claim with the new DLA Energy contracting officer, Mr. Rose, requesting a price adjustment under the 2011 and 2013 Contracts based on the taxes assessed by the Kyrgyz Republic. On or about October 22, 2015, the DLA Energy contracting officer, Mr. Rose, issued a final decision denying GPNA-K's claim in in its entirety. In coming to this conclusion, Mr. Rose made three findings: "The Tax Clause [FAR § 52.229-6] does not Authorize Payment of the Claimed Taxes"; "The Relevant International Agreements [including the Cooperation Agreement] Exclude Taxes"; and "GPNA-K Failed to Provide the Required Notice under the Contract."

GPNA-K filed a complaint in this court on December 1, 2015. In its complaint GPNA-K alleges that DLA Energy breached the requirements of FAR § 52.229-6(d) that were included in the 2011 and 2013 Contracts when DLA Energy failed to increase the price of the Contracts to reflect the additional profits taxes that were retroactively imposed by the Kyrgyz Republic. GPNA-K seeks damages in the amount of $16,814,785.31, which it alleges is the United States dollar equivalent of the various back taxes and penalties it was assessed by the Kyrgyz Republic, plus interest from the date the certified claim was submitted to the contracting officer and attorney's fees and costs. Defendant filed an answer on February 1, 2016. The parties then conducted discovery through December

12, 2016, following which, the parties simultaneously filed cross-motions for summary judgment, which have been fully briefed.

## DISCUSSION

Both parties have moved for summary judgment under Rule 56 of the Rules of the Court of Federal Claims (RCFC) (2016). RCFC 56 is similar to Rule 56 of the Federal Rules of Civil Procedure in language and effect. Both rules provide that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." RCFC 56(a); Fed. R. Civ. P. 56(a) (2017); see also Alabama v. North Carolina, 560 U.S. 330, 344 (2010); Hunt v. Cromartie, 526 U.S. 541, 549 (1999); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Adickes v. S. H. Kress & Co., 398 U.S. 144, 157 (1970); Biery v. United States, 753 F.3d 1279, 1286 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2014); Ladd v. United States, 713 F.3d 648, 651 (Fed. Cir. 2013); Minkin v. Gibbons, P.C., 680 F.3d 1341, 1349 (Fed. Cir. 2012); Noah Sys., Inc. v. Intuit Inc., 675 F.3d 1302, 1309-10 (Fed. Cir. 2012); Advanced Fiber Techs. (AFT) Trust v. J & L Fiber Servs., Inc., 674 F.3d 1365, 1372 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2012); Fujitsu Ltd. v. Netgear Inc., 620 F.3d 1321, 1325 (Fed. Cir.), reh'g denied (Fed. Cir. 2010); Consol. Coal Co. v. United States, 615 F.3d 1378, 1380 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2010), cert. denied, 131 S. Ct. 2990 (2011); 1st Home Liquidating Trust v. United States, 581 F.3d 1350, 1355 (Fed. Cir. 2009); Arko Exec. Servs., Inc. v. United States, 553 F.3d 1375, 1378 (Fed. Cir. 2009); Casitas Mun. Water Dist. v. United States, 543 F.3d 1276, 1283 (Fed. Cir. 2008), reh'g and reh'g en banc denied, 556 F.3d 1329 (Fed. Cir. 2009); Moden v. United States, 404 F.3d 1335, 1342 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2005); Am. Pelagic Fishing Co., L.P. v. United States, 379 F.3d 1363, 1370-71 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2004), cert. denied, 545 U.S. 1139 (2005); Mata v. United States, 114 Fed. Cl. 736, 744 (2014); Leggitte v. United States, 104 Fed. Cl. 315, 317 (2012); Arranaga v. United States, 103 Fed. Cl. 465, 467-68 (2012); Cohen v. United States, 100 Fed. Cl. 461, 469 (2011); Boensel v. United States, 99 Fed. Cl. 607, 610 (2011).

A fact is material if it will make a difference in the result of a case under the governing law. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 248; see also Marriott Int'l Resorts, L.P. v. United States, 586 F.3d 962, 968 (Fed. Cir. 2009) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. at 248); Mata v. United States, 114 Fed. Cl. at 744; Arranaga v. United States, 103 Fed. Cl. at 467-68; Thompson v. United States, 101 Fed. Cl. 416, 426 (2011); Cohen v. United States, 100 Fed. Cl. at 469. Irrelevant or unnecessary factual disputes do not preclude the entry of summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 247-48; see also Scott v. Harris, 550 U.S. 372, 380 (2007); Monon Corp. v. Stoughton Trailers, Inc., 239 F.3d 1253, 1257 (Fed. Cir. 2001); Gorski v. United States, 104 Fed. Cl. 605, 609 (2012); Walker v. United States, 79 Fed. Cl. 685, 692 (2008); Curtis v. United States, 144 Ct. Cl. 194, 199, 168 F. Supp. 213, 216 (1958), cert. denied, 361 U.S. 843 (1959), reh'g denied, 361 U.S. 941 (1960).

When reaching a summary judgment determination, the judge's function is not to weigh the evidence and determine the truth of the case presented, but to determine

whether there is a genuine issue for trial. <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. at 249; <u>see</u>, <u>e.g.</u>, <u>Schlup v. Delo</u>, 513 U.S. 298, 332 (1995); <u>Ford Motor Co. v. United States</u>, 157 F.3d 849, 854 (Fed. Cir. 1998) ("Due to the nature of the proceeding, courts do not make findings of fact on summary judgment."); <u>TigerSwan, Inc. v. United States</u>, 118 Fed. Cl. 447, 451 (2014); <u>Dana R. Hodges Trust v. United States</u>, 111 Fed. Cl. 452, 455 (2013); <u>Cohen v. United States</u>, 100 Fed. Cl. at 469-70; <u>Boensel v. United States</u>, 99 Fed. Cl. at 611; <u>Macy Elevator, Inc. v. United States</u>, 97 Fed. Cl. 708, 717 (2011); <u>Dick Pacific/GHEMM, JV ex rel. W.A. Botting Co. v. United States</u>, 87 Fed. Cl. 113, 126 (2009); <u>Johnson v. United States</u>, 49 Fed. Cl. 648, 651 (2001), <u>aff'd</u>, 52 F. App'x 507 (Fed. Cir. 2002), <u>published</u> <u>at</u> 317 F.3d 1331 (Fed. Cir. 2003). The judge must determine whether the evidence presents a disagreement sufficient to require submission to fact finding, or whether the issues presented are so one-sided that one party must prevail as a matter of law. <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. at 250-52; <u>Jay v. Sec'y of Dep't of Health and Human Servs.</u>, 998 F.2d 979, 982 (Fed. Cir.), <u>reh'g</u> <u>denied</u> <u>and</u> <u>en</u> <u>banc</u> <u>suggestion</u> <u>declined</u> (Fed. Cir. 1993); <u>Leggitte v. United States</u>, 104 Fed. Cl. at 316. When the record could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial, and the motion must be granted. <u>See</u>, <u>e.g.</u>, <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986); <u>Advanced Fiber Techs. (AFT) Trust v. J & L Fiber Servs., Inc.</u>, 674 F.3d at 1372; <u>Marriott Int'l Resorts, L.P. v. United States</u>, 586 F.3d at 968; <u>Am. Seating Co. v. USSC Grp., Inc.</u>, 514 F.3d 1262, 1266 (Fed. Cir.), <u>reh'g</u> <u>en</u> <u>banc</u> <u>denied</u> (Fed. Cir. 2008); <u>Rothe Dev. Corp. v. U.S. Dep't of Def.</u>, 262 F.3d 1306, 1316 (Fed. Cir. 2001); <u>Hall v. Aqua Queen Mfg., Inc.</u>, 93 F.3d 1548, 1553 n.3 (Fed. Cir. 1996). In such cases, there is no need for the parties to undertake the time and expense of a trial, and the moving party should prevail without further proceedings.

> In appropriate cases, summary judgment:

> saves the expense and time of a full trial when it is unnecessary. When the material facts are adequately developed in the motion papers, a full trial is useless. "Useless" in this context means that more evidence than is already available in connection with the motion for summary judgment could not reasonably be expected to change the result.

<u>Dehne v. United States</u>, 23 Cl. Ct. 606, 614-15 (1991) (quoting <u>Pure Gold, Inc. v. Syntex, (U.S.A.) Inc.</u>, 739 F.2d 624, 626 (Fed. Cir. 1984)), <u>vacated</u> <u>on</u> <u>other</u> <u>grounds</u>, 970 F.2d 890 (Fed. Cir. 1992) (citation omitted); <u>see</u> <u>also</u> <u>Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.</u>, 200 F.3d 795, 806 (Fed. Cir. 1999) ("The purpose of summary judgment is not to deprive a litigant of a trial, but to avoid an unnecessary trial when only one outcome can ensue."); <u>Metric Constr. Co., Inc. v. United States</u>, 73 Fed. Cl. 611, 612 (2006).

Summary judgment, however, will not be granted if "the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. at 248; <u>see</u> <u>also</u> <u>Long Island Sav. Bank, FSB v. United States</u>, 503 F.3d 1234, 1244 (Fed. Cir.), <u>reh'g</u> <u>and</u> <u>reh'g</u> <u>en</u> <u>banc</u> <u>denied</u> (Fed. Cir. 2007), <u>cert.</u> <u>denied</u>, 555 U.S. 812 (2008); <u>Eli Lilly & Co. v. Barr Labs., Inc.</u>, 251 F.3d 955, 971 (Fed. Cir.), <u>reh'g</u> <u>and</u> <u>reh'g</u> <u>en</u> <u>banc</u> <u>denied</u> (Fed. Cir. 2001), <u>cert.</u> <u>denied</u>, 534 U.S. 1109 (2002); <u>Gen. Elec. Co. v. Nintendo Co.</u>, 179

F.3d 1350, 1353 (Fed. Cir. 1999); TigerSwan, Inc. v. United States, 118 Fed. Cl. at 451; Stephan v. United States, 117 Fed. Cl. 68, 70 (2014); Gonzales-McCaulley Inv. Group, Inc. v. United States, 101 Fed. Cl. 623, 629 (2011). In other words, if the nonmoving party produces sufficient evidence to raise a question as to the outcome of the case, then the motion for summary judgment should be denied. Any doubt over factual issues must be resolved in favor of the party opposing summary judgment, to whom the benefit of all presumptions and inferences runs. See Ricci v. DeStefano, 557 U.S. 557, 586 (2009); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. at 587-88; Yant v. United States, 588 F.3d 1369, 1371 (Fed. Cir. 2009), cert. denied, 131 S. Ct. 69 (2010); Dethmers Mfg. Co. v. Automatic Equip. Mfg. Co., 272 F.3d 1365, 1369 (Fed. Cir. 2001), reh'g and reh'g en banc denied, 293 F.3d 1364 (Fed. Cir. 2002), cert. denied, 539 U.S. 957 (2003); Monon Corp. v. Stoughton Trailers, Inc., 239 F.3d at 1257; Wanlass v. Fedders Corp., 145 F.3d 1461, 1463 (Fed. Cir.), reh'g denied and en banc suggestion declined (Fed. Cir. 1998); see also Am. Pelagic Co. v. United States, 379 F.3d at 1371 (citing Helifix Ltd. v. Blok-Lok, Ltd., 208 F.3d 1339, 1345-46 (Fed. Cir. 2000)); Dana R. Hodges Trust v. United States, 111 Fed. Cl. at 455; Boensel v. United States, 99 Fed. Cl. at 611 ("'The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. at 255) (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. at 587-88; Casitas Mun. Water Dist. v. United States, 543 F.3d at 1283; Lathan Co. Inc. v. United States, 20 Cl. Ct. 122, 125 (1990))); see also Am. Seating Co. v. USSC Grp., Inc., 514 F.3d at 1266-67; Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc., 200 F.3d at 807. "However, once a moving party satisfies its initial burden, mere allegations of a genuine issue of material fact without supporting evidence will not prevent entry of summary judgment." Republic Sav. Bank, F.S.B. v. United States, 584 F.3d 1369, 1374 (Fed. Cir. 2009); see also Anderson v. Liberty Lobby, Inc., 477 U.S. at 247-48.

The initial burden on the party moving for summary judgment to produce evidence showing the absence of a genuine issue of material fact may be discharged if the moving party can demonstrate that there is an absence of evidence to support the nonmoving party's case. See Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986); see also Riley & Ephriam Constr. Co. v. United States, 408 F.3d 1369, 1371 (Fed. Cir. 2005); Crown Operations Int'l Ltd. v. Solutia Inc., 289 F.3d 1367, 1377 (Fed. Cir.), reh'g denied (Fed. Cir. 2002); Trilogy Commc'ns, Inc. v. Times Fiber Commc'ns, Inc., 109 F.3d 739, 741 (Fed. Cir.) (quoting Conroy v. Reebok Int'l, Ltd., 14 F.3d 1570, 1575 (Fed. Cir. 1994), reh'g denied and en banc suggestion declined (Fed. Cir. 1995)), reh'g denied and en banc suggestion declined (Fed. Cir. 1997); Lockwood v. Am. Airlines, Inc., 107 F.3d 1565, 1569 (Fed. Cir. 1997); Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc., 200 F.3d at 807; RQ Squared, LLC v. United States, 119 Fed. Cl. 751, 758 (2015). If the moving party makes such a showing, the burden shifts to the nonmoving party to demonstrate that a genuine dispute regarding a material fact exists by presenting evidence which establishes the existence of an element essential to its case upon which it bears the burden of proof. See Celotex Corp. v. Catrett, 477 U.S. at 322; see also Wavetronix LLC v. EIS Elec. Integrated Sys., 573 F.3d 1343, 1354 (Fed. Cir. 2009); Long Island Sav. Bank, FSB v. United States, 503 F.3d at 1244; Florida Power & Light Co. v. United States, 375 F.3d 1119, 1124 (Fed. Cir. 2004); Schoell v. Regal Marine Indus., Inc., 247 F.3d 1202, 1207 (Fed. Cir. 2001); Am. Airlines, Inc. v. United States, 204 F.3d 1103, 1108 (Fed. Cir. 2000); Vivid Techs.,

Inc. v. Am. Sci. & Eng'g, Inc., 200 F.3d at 807; Rasmuson v. United States, 109 Fed. Cl. 267, 271 (2013). However, "a non-movant is required to provide opposing evidence under Rule 56(e) only if the moving party has provided evidence sufficient, if unopposed, to prevail as a matter of law."  Saab Cars USA, Inc. v. United States, 434 F.3d 1359, 1369 (Fed. Cir. 2006).

Even if both parties argue in favor of summary judgment and allege an absence of genuine issues of material fact, the court is not relieved of its responsibility to determine the appropriateness of summary disposition in a particular case, and it does not follow that summary judgment should be granted to one side or the other.  See Prineville Sawmill Co. v. United States, 859 F.2d 905, 911 (Fed. Cir. 1988) (citing Mingus Constructors, Inc. v. United States, 812 F.2d 1387, 1391 (Fed. Cir. 1987)); see also Marriott Int'l Resorts, L.P. v. United States, 586 F.3d 962, 968–69 (Fed. Cir. 2009); B.F. Goodrich Co. v. U.S. Filter Corp., 245 F.3d 587, 593 (6th Cir. 2001); Atl. Richfield Co. v. Farm Credit Bank of Wichita, 226 F.3d 1138, 1148 (10th Cir. 2000); Chevron USA, Inc. v. Cayetano, 224 F.3d 1030, 1037 n.5 (9th Cir. 2000), cert. denied, 532 U.S. 942 (2001); Bubble Room, Inc. v. United States, 159 F.3d 553, 561 (Fed. Cir. 1998) ("The fact that both the parties have moved for summary judgment does not mean that the court must grant summary judgment to one party or the other."), reh'g denied and en banc suggestion declined (Fed. Cir. 1999); Allstate Ins. Co. v. Occidental Int'l, Inc., 140 F.3d 1, 2 (1st Cir. 1998); Massey v. Del Labs., Inc., 118 F.3d 1568, 1573 (Fed. Cir. 1997); LewRon Television, Inc. v. D.H. Overmyer Leasing Co., 401 F.2d 689, 692 (4th Cir. 1968), cert. denied, 393 U.S. 1083 (1969); Rogers v. United States, 90 Fed. Cl. 418, 427 (2009), subsequent determination, 93 Fed. Cl. 607 (2010); Consol. Coal Co. v. United States, 86 Fed. Cl. 384, 387 (2009), aff'd, 615 F.3d 1378, (Fed. Cir.), and reh'g and reh'g en banc denied (Fed. Cir. 2010), cert. denied, 131 S. Ct. 2990 (2011); St. Christopher Assocs., L.P. v. United States, 75 Fed. Cl. 1, 8 (2006), aff'd, 511 F.3d 1376 (Fed. Cir. 2008); Reading & Bates Corp. v. United States, 40 Fed. Cl. 737, 748 (1998).  The court must evaluate each party's motion on its own merits, taking care to draw all reasonable inferences against the party whose motion is under consideration, or, otherwise stated, in favor of the non-moving party.  See First Commerce Corp. v. United States, 335 F.3d 1373, 1379 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2003); see also DeMarini Sports, Inc. v. Worth, Inc., 239 F.3d 1314, 1322 (Fed. Cir. 2001); Gart v. Logitech, Inc., 254 F.3d 1334, 1338–39 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2001), cert. denied, 534 U.S. 1114 (2002); Oswalt v. United States, 85 Fed. Cl. 153, 158 (2008); Telenor Satellite Servs., Inc. v. United States, 71 Fed. Cl. 114, 119 (2006).

Cross-motions are no more than a claim by each party that it alone is entitled to summary judgment.  The making of such inherently contradictory claims, however, does not establish that if one is rejected the other necessarily is justified.  See B.F. Goodrich Co. v. United States Filter Corp., 245 F.3d at 593; Atl. Richfield Co. v. Farm Credit Bank of Wichita, 226 F.3d at 1148; Allstate Ins. Co. v. Occidental Int'l, Inc., 140 F.3d at 2; Rogers v. United States, 90 Fed. Cl. at 427; Reading & Bates Corp. v. United States, 40 Fed. Cl. at 748.

"Questions of law are particularly appropriate for summary judgment."  Oenga v. United States, 91 Fed. Cl. 629, 634 (2010) (citing Dana Corp. v. United States, 174 F.3d

1344, 1347 (Fed. Cir. 1999) ("Summary judgment was appropriate here [in <u>Dana Corp.</u>] because no material facts were disputed, many being stipulated, and the only disputed issues were issues of law.  Moreover, on each issue one party or the other is entitled to judgment as a matter of law.")); <u>see also</u> <u>Santa Fe Pac. R.R. v. United States</u>, 294 F.3d 1336, 1340 (Fed. Cir. 2002) ("Issues of statutory interpretation and other matters of law may be decided on motion for summary judgment.").

In their cross-motions for summary judgment, the parties dispute two issues arising under language from FAR § 52.229-6 contained in the 2011 and 2013 Contracts: (1) whether the Kyrgyz taxes paid by GPNA-K are of the type reimbursable under FAR § 52.229-6(d); and (2) whether, if otherwise subject to a valid claim, GPNA-K lost its rights to compensation under the 2011 and 2013 Contracts by failing to provide the defendant with sufficient, prompt notice in violation of FAR § 52.229-6(j).

1. <u>Are the Taxes Reimbursable under FAR § 52.229-6(d)?</u>

With regard to the impact of FAR § 52.229-6(d), the dispute concerns the portion of FAR § 52.229-6(d) which states: "The contract price shall be increased by the amount of any after-imposed tax or of any tax or duty specifically excluded from the contract price by a provision of this contract that the Contractor is required to pay or bear, including any interest or penalty . . . ." Defendant argues that the taxes that GPNA-K seeks to recover, which the Kyrgyz government characterized as profits taxes, are not recoverable under FAR § 52.229-6(d) because they do not qualify as "after-imposed tax[es]." Defendant notes that the definition of an "after-imposed tax" in FAR § 52.229-6(b) excludes "excepted tax[es]" such as "net income" taxes, which defendant argues characterizes the profits taxes imposed on GPNA-K by the Kyrgyz government. According to defendant, any interpretation of FAR § 52.229-6(d) that would permit recovery of such "excepted tax[es]" is improper because it would render "[s]uperfluous" and "nullify" the portion of FAR § 52.229-6(d) regarding "after-imposed tax[es]."

GPNA-K rejects defendant's argument, asserting that defendant "fundamentally misreads" FAR § 52.229-6(d). According to GPNA-K, the inclusion of the word "or" in FAR § 52.229-6(d) means that the government is liable for not just "after-imposed tax[es]" but also any taxes "excluded from the contract by a provision of th[e] contract." GPNA-K argues that another provision of the 2011 and 2013 Contracts, FAR § 52.229-6(c), excludes taxes and duties that the United States and the Kyrgyz Republic agreed would "not be applicable," which GPNA-K argues includes any taxes covered by Cooperation Agreement. According to GPNA-K, because the Cooperation Agreement excluded "any tax," the profits taxes that GPNA-K was required to pay are covered by FAR § 52.229-6(d), regardless of whether they qualify as "after-imposed tax[es]."

The court finds that FAR § 52.229-6(d) applies to taxes covered by the Cooperation Agreement, regardless of whether they qualify as "after-imposed tax[es]." The word "or," ordinarily, is disjunctive, "'connecting two members [of the sentence] but disconnecting their meaning, the meaning in the second member excluding that in the first.'" <u>Ruben by Ruben v. Sec'y of Dep't of Health & Human Servs.</u>, 22 Cl. Ct. 264, 266 (1991) (alteration in original) (quoting 2 G. Curme, <u>A Grammar of the English Language, Syntax</u> 166 (1986)) (citing <u>Florsheim Shoe Co., Div. of Interco, Inc. v. U.S.</u>, 744 F.2d 787,

12

795 (Fed. Cir. 1984), United States v. Moore, 613 F.2d 1029, 1040 (D.C. Cir. 1979), cert. denied, 446 U.S. 954, (1980), and George Hyman Constr. Co. v. Occupational Safety & Health Review Comm'n, 582 F.2d 834, 840 n. 10 (4th Cir. 1978)). As noted above, FAR § 52.229-6(d) requires that the United States government increase the contract price in the amount "of any after-imposed tax or of any tax or duty specifically excluded from the contract price by a provision of this contract that the Contractor is required to pay or bear, including any interest or penalty." FAR § 52.229-6(d) (emphasis added). The use of the word "or" in this sentence, thus, indicates that the existence of the condition listed after the "or," taxes "specifically excluded from the contract price by a provision of [the] contract[s]," is sufficient to trigger the government's obligations to pay regardless of the presence of the condition listed prior to the "or," "after-imposed tax[es]." See Markovich v. Sec'y of Health & Human Servs., 477 F.3d 1353, 1357 (Fed. Cir. 2007) ("Because Congress is presumed to have intended a disjunctive meaning by using the disjunctive word 'or,' we interpret the words 'first symptom' and 'manifestation of onset' [in the phrase 'first symptom or manifestation of onset'] as referring to two different forms of evidence of injury."); Ruben by Ruben v. Sec'y of Dep't of Health & Human Servs., 22 Cl. Ct. at 266 ("Interpreting the term 'or' in Section 2115(f)(4)(B) as disjunctive here would tend to support the special master's discretion to award an annuity without the petitioners' consent in that the two pertinent parts of the statute, before and after the word 'or,' would be treated as disconnected.").

The contracts at issue specifically exclude certain taxes from the contract price by including another provision of the FAR, FAR § 52.229-6(c), which states that "the contract price includes all applicable taxes and duties, except taxes and duties that the Government of the United States and the government of the country concerned have agreed shall not be applicable to expenditures in such country by or on behalf of the United States." The Cooperation Agreement, which was an agreement between the government of the United States and the "country concerned," the Kyrgyz Republic, states in Article 4 that Department of Defense contractors

> shall not be liable to pay any tax or similar charge assessed within the territory of the Kyrgyz Republic, except that contractors and contractor personnel normally resident in the territory of the Kyrgyz Republic shall only be exempt from any tax or similar charge assessed within the Kyrgyz Republic in connection with activities under this Agreement.

The Cooperation Agreement also states in Article 7 that "[a]cquisition of articles . . . in the Kyrgyz Republic by or on behalf of the Government of the United States of America in implementing this agreement shall not be subject to any taxes . . . in the territory of the Kyrgyz Republic." Thus, under the Cooperation Agreement, United States government contractors were not to be subject to "any taxes" for sales made to the United States government in the Kyrgyz Republic "in connection with activities under" or "in implementing" the Cooperation Agreement. Any such taxes imposed on a contractor would violate the Cooperation Agreement and would be reimbursable under FAR § 52.229-6(d). Under the language of FAR § 52.229-6(d), this would be true regardless of whether such taxes qualified as after-imposed taxes.

The 2011 and 2013 Contracts were entered into between GPNA-K and DLA Energy, a government component of the United States Department of Defense, making GPNA-K a Department of Defense contractor. The sales of jet fuel made by GPNA-K to DLA Energy under the 2011 and 2013 Contracts for the use of the United States armed forces, were made pursuant the Kyrgyz Prime Minister's April 18, 2011 order implementing the February 8, 2011 Manas Jet Fuel Agreement. The Manas Jet Fuel Agreement, by its own terms, was entered into by the United States and the Kyrgyz Republic in recognition of the Cooperation Agreement. GPNA-K's sales, thus, were made "in connection with activities under" and "in implementing" the Cooperation Agreement, and should have been exempt from taxation by the Kyrgyz government under Articles 4 and 7 of the Cooperation Agreement.[3]

Defendant does not, in its filings presently before the court, challenge the conclusion that the sales at issue should have been exempt from taxation under the terms of the Cooperation Agreement. Moreover, Jamaal Rose, the DLA contracting officer who denied GPNA-K's claim for a price adjustment to the contracts in his October 22, 2015 final decision, and on whose affidavit testimony defendant relies, concluded that "The Relevant International Agreements Exclude Taxes" after he had examined Articles 4 and 7 of the Cooperation Agreement, as well as the February 8, 2011 Manas Fuel Agreement."[4] Further, if any ambiguity about this conclusion exists, which the court does

---

[3] When denying GPNA-K's appeal of the lower Kyrgyz court decisions which upheld the Kyrgyz Tax Service's imposition of profits taxes on GPNA-K, the Kyrgyz Supreme Court came to the following conclusion regarding the applicability of the Cooperation Agreement:

> Based on the legal nature of the transactions done by Gazpromneft – Aero Kyrgyzstan LLC for delivery of aviation fuel, under the laws of the Kyrgyz Republic the court believes that existing contractual relations between the CTS [Center for Transit Shipments, i.e., the Manas Transit Center] and Gazpromneft – Aero Kyrgyzstan cannot be covered by the disposition of articles 4 and 7 of the [Cooperation] Agreement. One of the proofs of this conclusion is the fact that Gazpromneft – Aero Kyrgyzstan LLC pays income tax on employees despite the fact that article 4 of the Agreement extends also in that case to the personnel of contractors, as well as sales tax.

This court respectfully disagrees with the reasoning of the Kyrgyz Supreme Court, even if it is true that GPNA-K paid income tax for its employees, as well as some sort of sales tax, although there is not sufficient evidence in the record to reach such a final determination. The facts in the record demonstrate that GPNA-K's fuel sales to DLA Energy under the 2011 and 2013 Contracts were made in connection with activities under, and in order to implement, the Cooperation Agreement between the Kyrgyz Republic and the defendant. The fuel sales at issue, thus, were exempt from taxation under Articles 4 and 7 of the Cooperation Agreement.

[4] Mr. Rose's understanding of the significance of his finding that "The Relevant International Agreements Exclude Taxes" is somewhat unclear. In his final decision, the

not believe is the case, it would be resolved by the statement in GPNA-K's July 15, 2011 email to DLA Energy, which was explicitly incorporated by reference into  the 2011 and 2013 Contracts, that the "Price of jet fuel dedicated to MTC [Manas Transit Center] does not include any taxes, duties and fees of the Kyrgyz Republic according [to] terms of [the] agreement between [the] governments of Kyrgyz Republic and USA." Because the taxes at issue in the present case were exempt from taxation under the terms of the Cooperation Agreement, they were reimbursable under the 2011 and 2013 Contracts.

2. Are Plaintiff's Claims Barred due to Failure to Promptly Notify the Contracting Officer as Required by FAR § 52.229-6(j)?

The second issue in the present cross-motions concerns whether GPNA-K breached its duty under FAR § 52.229-6(j) and the contracts to "promptly notify the Contracting Officer of all matters relating to taxes or duties that reasonably may be expected to result in either an increase or decrease in the contract price" so that GPNA-K is foreclosed from recouping the taxes at issue. Defendant argues that GPNA-K's notice to the government cannot be considered prompt because GPNA-K waited over two years to notify DLA Energy's contracting officer after it first became aware that the Kyrgyz Tax Service was assessing taxes against the company. Defendant argues that GPNA-K first became aware that the Kyrgyz Tax Service planned to assess taxes against GPNA-K, regardless of the Cooperation Agreement, in November 24, 2011, when the Kyrgyz Tax Service informed GPNA-K that it believed there was no right to exemption from profits taxes under the Cooperation Agreement, and that the Kyrgyz Tax Service's position was confirmed on June 20, 2012 when it issued its audit of the taxes paid on GPNA-K's jet fuel sales for 2011 and the first quarter of 2012. According to defendant, this alone is fatal to GPNA-K's claim because, as a party seeking reimbursement of foreign taxes under FAR § 52.229-6, which was incorporated into the contracts at issue, GPNA-K must comply with all contractual provisions, regardless of whether GPNA-K's actions prejudiced the government. Further, even if prejudice must be shown, defendant argues that GPNA-K's actions did prejudice the government because, had the government been given prompt notice of the imposition of the Kyrgyz taxes, it could have tried to challenge the taxes or negotiate a satisfactory solution with the Kyrgyz government. In support, defendant provides affidavits from two Department of Defense employees, including the DLA Energy contracting officer, Mr. Jamaal Rose.

While making no explicit concessions, in its briefs filed with the court, GPNA-K does not attempt to rebut defendant's argument that its actions did not amount to the sort of "prompt[]" notice required by FAR § 52.229-6(j). Instead, GPNA-K argues that, under

---

contracting officer failed to note that FAR 52.229-6(d) covers "any tax or duty specifically excluded from the contract price by a provision of this contract." Instead, the Contracting Officer found that "FAR clause 52.229-6 does not authorize payment of the type of taxes GAK [i.e., GPNA-K] is claiming" on the grounds that the profits taxes GPNA-K paid to the Kyrgyz government did not meet the definition of an "after-imposed tax" under FAR 52.229-6. The contracting officer then proceeded to make a finding that the "The Relevant International Agreements," including the Cooperation Agreement, "Exclude Taxes" without any explanation as to the relevance or significance of this finding.

relevant case law, the government must show that any alleged failure to provide timely notice prejudiced the government in order to bar a contractor's claim. According to GPNA-K, the government cannot show prejudice in the present case because any potential opportunities to reduce or avoid liability that GPNA-K's allegedly untimely notice may have resulted in were not "wholly within the government's control." Thus, according to plaintiff, defendant's arguments about prejudice amount to mere speculation. Plaintiff further argues that the evidence proffered by the defendant in order to show prejudice is so impermissibly speculative that GPNA-K is entitled to summary judgment. Alternatively, GPNA-K also argues that there exists an issue of material fact regarding the existence of prejudice precluding summary judgment in the government's favor based on an affidavit it has provided from the current general director of GPNA-K.

Initially, the court finds that GPNA-K failed to meet its contractual obligation to "promptly notify the Contracting Officer of all matters relating to taxes or duties that reasonably may be expected to result in either an increase or decrease in the contract price." FAR § 52.229-6(j). The imposition of taxes by the Kyrgyz Tax Service on GPNA-K's fuel sales to DLA Energy should have been expected to result in an increase of the contract price, and, thus, should have triggered GPNA-K's notification obligation, because the inclusion of FAR § 52.229-6(d) in the contract required that the contract price be increased by the amount of such taxes. The Kyrgyz Tax Service issued its order authorizing an audit of GPNA-K with regard to its fuel sales in 2011 and the first quarter of 2012 on June 20, 2012, and, then, issued its initial decision finding GPNA-K owed back profits taxes for these periods on August 7, 2012. The Kyrgyz Tax Service issued a second order assessing additional back profits taxes for the remainder of 2012, 2013 and the first quarter of 2014 on June 24, 2014. The first time the record demonstrates that plaintiffs even attempted to raise these tax issues with the DLA Energy contracting officer was in their October 20, 2014 letter directed to Mr. Moore, whether or not it was received, which was 26 months after GPNA-K first learned that it was being audited on June 20, 2012 and 24 months after the Kyrgyz Tax Services' first assessment of such back taxes on August 7, 2012.[5]

Although it is true that GPNA-K subsequently challenged the decisions of the Kyrgyz Tax Service in the Kyrgyz courts, the FAR notice provision of the contract did not allow GPNA-K to wait until its tax obligations were totally certain before contacting the contracting officer. Instead the FAR provision in the contracts, FAR § 52.229-6(j), required GPNA-K to "promptly notify the Contracting Officer of all matters relating to taxes or duties that reasonably may be expected to result in either an increase or decrease in the contract price," in this case an increase due to the imposition of Kyrgyz taxes. FAR § 52.229-6(j) (emphasis added). GPNA-K, reasonably, should have expected that the back

---

[5] As noted above, the October 20, 2014 letter directed to Mr. Moore apparently failed to reach DLA Energy due to Mr. Moore's earlier retirement. Thus, it appears that the first time a DLA Energy contracting officer, actually, was made aware of GPNA-K's tax issues was when GPNA-K's subsequent letter to Mr. Moore was forwarded to a replacement contracting officer on or about March 27, 2015. Because the court finds that even the earlier October 20, 2014 date would have provided insufficiently prompt notice, it need not assess the impact of DLA Energy's apparently having not received this earlier letter.

taxes imposed by the Kyrgyz Tax Service would be due after the service completed its first audit and issued its initial decision finding that GPNA-K owed such taxes on August 7, 2012, at the latest. Further, although the initial Kyrgyz Tax Service decision in August 2012 covered only sales in 2011 and the first quarter of 2012, GPNA-K should have reasonably expected that the Kyrgyz Tax Service also would assess similar taxes on any sales GPNA-K made to DLA Energy moving forward, as the Kyrgyz Tax Service ultimately did. Despite this, GPNA-K waited over two years, until October 20, 2014, to fulfill its contractual obligation of "promptly" notifying the contracting officer. Given the lack of any offered, extenuating circumstances, the court cannot consider a more than two year delay to provide notice to be "prompt[]." Indeed, GPNA-K's failure to alert the contracting officer of the ongoing tax assessments earlier is particularly egregious in light of the fact that GPNA-K actually was in communication with DLA Energy a number of times during this period, while negotiating the 2013 Contract in December 2012 and January 2013, signing the 2013 Contract in March 2013, and negotiating a possible third contract in February 2014.

As noted above, GPNA-K does not appear to challenge the conclusion that it failed to "promptly notify" the contracting officer, as required by the contracts at issue. Instead, GPNA-K argues that its claims are not barred by any such failure because defendant has failed to demonstrate that the lack of notice prejudiced the United States government. Although there appears to be no applicable case law interpreting the notice provision of FAR § 52.229-6, cases in this court and at the Armed Services Board of Contract Appeals (ASBCA) have examined a similar provision in FAR § 52.236-2, the FAR provision concerning equitable adjustments for differing site conditions, which requires contractors to "promptly . . . give a written notice to the Contracting Officer" of differing site conditions in order to receive an equitable adjustment. FAR § 52.236-2(a) (Apr. 1984). Despite this seemingly definitive notice requirement, the cases have held that "[b]ecause the purpose of the notice requirement is to allow the government to mitigate costs that might result from the differing site condition, a contractor that fails to provide adequate notice will not be barred from recovery unless the government is prejudiced by the lack of notice." Ace Constructors, Inc. v. United States, 70 Fed. Cl. 253, 272 (2006), aff'd, 499 F.3d 1357 (Fed. Cir. 2007) (citing Shepherd v. United States, 125 Ct. Cl. 724, 113 F. Supp. 648, 651–52 (1953) and John Cibinic & Ralph Nash, Administration of Government Contracts 533 (3d ed.1995) (citing numerous ASBCA decisions); see also, e.g., George Sollitt Constr. Co. v. United States, 64 Fed. Cl. 229, 291 (2005) ("'In order to prevail in a case in which notice [of a differing site condition] has not been provided on a timely basis by the contractor, the government has the burden of proving that the untimeliness caused prejudice to its case.'" (alteration in original) (quoting Big Chief Drilling Co. v. United States, 15 Cl. Ct. 295, 303 (1988)); cf. John Cibinic, Jr., James F. Nagle, & Ralph C. Nash, Jr., Administration of Government Contracts 425 (5th ed. 2015) ("[The 30 day notice requirement of the FAR's changes clauses, FAR § 52.243-1 (Aug. 1987) and FAR § 52.243-4 (June 2007),] has been interpreted liberally in numerous holdings that failure to submit this notice will not bar a contractor's claim unless the government can show that the lack of notice was prejudicial in some way[.]"). Defendant concedes in its reply brief submitted to this court that FAR § 52.229-6(j), the provision at issue in the case currently before this court, shares essentially the same cost mitigation motivation as FAR § 52.236-2(a), stating: "The purpose behind the requirement in Federal Acquisition Regulation

(FAR) § 52.229-6(j) for the contractor to 'promptly notify' the Government is to allow the Government to address and mitigate the imposition of taxes."

Despite this concession, defendant argues that a contractor's untimely notice should bar recovery under FAR § 52.229-6 regardless of the existence of any prejudice to the government, citing two decisions of the ASBCA interpreting provisions of FAR § 52.229-6, Encorp, ASBCA No. 51293, 01-1 B.C.A. (CCH) ¶ 31165 (Nov. 7, 2000) and H.Z. & Co., Ltd., ASBCA No. 29590, 85-2 B.C.A. (CCH) ¶ 18062 (Feb. 19, 1985).[6] The persuasive value of the two ASBCA decisions cited by defendant is limited, however, because neither decision was premised on a lack of notice, but, instead, on circumstances absent from the present case. Encorp did not involve the notice provision at issue in the present case, FAR § 52.229-6(j), but instead FAR § 52.229-6(i), which requires contractors to "take all reasonable action to obtain exemption from or refund of any taxes or duties . . . from which the United States Government [or] the Contractor . . . are exempt under the laws of the country concerned." FAR § 52.229-6(i). The ASBCA in Encorp found that the plaintiff-contractor had failed to meet the requirements of FAR § 52.229-6(i), and, therefore, denied recovery, on the grounds that the contractor had made no attempts to avoid paying the taxes at issue prior to their imposition and that its attempts to obtain a refund after the taxes had been levied were "wholly deficient," involving a total failure to institute any legal action under the local country's legal system. See Encorp, ASBCA No. 51293. As such, Encorp is distinguishable from the present case in which GPNA-K made substantial efforts under the local legal system, but failed to promptly notify the defendant of the imposition of taxes contrary to the expectations established in the contractual agreements. Similarly, in H.Z. & Co., the ASBCA denied recovery under FAR § 52.229-6 on the grounds that the costs the contractor sought to recover were incurred "because it failed to follow the [Resident Officer in Charge of Construction's] instructions" and failed to provide a specific written warranty required by the contract as a "mandatory prerequisite to contractor reimbursement," circumstances absent from the present case. See H.Z. & Co., Ltd., ASBCA No. 29590.

Assuming, for the purposes of this case, without deciding, that there is a basis for concluding that the prompt notification requirement in FAR § 52.229-6(j) need not be strictly enforced, and that prejudice should be a requirement for prevailing, the court notes "[t]he government can show prejudice by demonstrating either that it might have minimized extra costs if proper notice had been given, or the passage of time obscured the elements of proof." Ace Constructors, Inc. v. United States, 70 Fed. Cl. at 272 (citing Seaboard Lumber Co. v. United States, 45 Fed. Cl. 404, 407 (1999), Calfon Constr., Inc.

---

[6] Defendant also cites, as a "cf.," to a statement in Raytheon Co. v. United States, 747 F.3d 1341, 1352 (Fed. Cir. 2014) that a contractor "had an existing contractual obligation to calculate segment closing adjustments pursuant to CAS [Cost Accounting Standard] 413–50(c)(12)." The court questions the relevance of defendant's citation to the Raytheon case regarding the issue of prejudice, as the passage cited by defendant is simply a statement of fact made in the context of the Federal Circuit's discussion of which party held the relevant burden of proof. See id. at 1352-53. ("Here, the Government bears the burden of showing that Raytheon did, in fact, fail to follow the terms of its contracts (i.e., that Raytheon's segment closing calculations do not comply with CAS 413).").

v. United States, 18 Cl. Ct. 426, 439 (1989), aff'd, 923 F.2d 872, (Fed. Cir. 1990), and Cibinic & Nash at 533)). As there is no accusation or evidence in the present case that the passage of time has obscured the elements of proof, to prevail the defendant can demonstrate that it might have been able to minimize the extra imposed costs had it received timely notice.[7] GPNA-K, however, argues that there is an additional element that the government must demonstrate: that the steps the government might have taken to minimize costs would have been "unilateral," that is "wholly within the government's [i.e., the defendant's] control" and involving no "guessing about reactions of third parties." In support of this proposition, GPNA-K cites a single case, K-Con Building Systems, Inc. v. United States, 778 F.3d 1000 (Fed. Cir. 2015).[8] In K-Con, the plaintiff-contractor, K-Con Building Systems, Inc. (K-Con), sought reimbursement pursuant to a provision of the FAR governing contract changes, FAR § 52.243-4 (Aug. 1987), that was included in the contract. See id. at 1004, 1009. The United States Court of Appeals for the Federal Circuit affirmed the decision of the United States Court of Federal Claims denying K-Con's claim on the grounds that K-Con's notice to the contracting officer of the alleged changes was untimely, made "more than two years after any of the changes at issue were allegedly ordered . . . well beyond the 20-day time limit imposed by" the notice provision of FAR § 52.243-4. Id. at 1010. The Federal Circuit rejected K-Con's argument that "it did not have to comply with the notice provision . . . because compliance would have been futile" on the grounds that, "[e]ven if a futility exception exists," K-Con had failed to demonstrate that timely notice would have proved futile. Id. In particular, the Federal Circuit found that "it is unknown what would have happened had K-Con broached the issue of changes around the time the [government] made the work requests at issue." Further, the Federal Circuit also indicated that, if timely notice had been provided, the government would have had "at least four options—refraining from making requests regarding K-Con's work, altering the nature of the requests, keeping the requests the same but making equitable adjustments to the contract, or rejecting the allegations of changes altogether and thereby risking litigation or a halt to the project." Id. at 1010-11.

It is this last statement from the K-Con case, which described the government's "four options," that GPNA-K points to as support for its requirement that the opportunity to minimize costs must have been "wholly within the government's control." Even the

_____

[7] Although the government holds the burden of proof to show prejudice in cases involving FAR § 52.236-2, see Ace Constructors, Inc. v. United States, 70 Fed. Cl. at 272 (citing Cibinic & Nash Administration of Government Contracts 533 (3d ed.1995)), the government argues that the burden of proof in cases involving FAR 52.229-6 should be on the contractor on the grounds that decisions of the United States Court of Federal Claims and the ASBCA have allegedly placed the burden of proof on plaintiffs to show lack of prejudice in the context of certain other non-FAR § 52.229-6 or FAR § 52.236-2 reimbursement cases. Because the court finds below that the government has provided sufficient evidence to meet its burden of proof, the court need not address defendant's arguments in this regard.

[8] GPNA-K states that there are "cases" supporting its alleged rule, and cites to K-Con in its reply brief with a "[s]ee[,] e.g.," but fails to identify any cases other than K-Con in either its main or reply brief.

minimal context regarding the statement offering a description of the "four options" quoted above, however, demonstrates that the K-Con decision did not lay down the rule upon which plaintiff seeks to rely. Instead, the Federal Circuit recounted the steps the government might have taken, under the particular facts of the K-Con case, to minimize its liability, had it been given timely notice, in order to counter the K-Con plaintiff's argument that such notice would have proved futile. The K-Con court gave no indication that, had the government's actions required the intervention or assistance of a third party, then it would have excused K-Con's untimely notice. Indeed, such a requirement would bear only tangential relevance to the issue on which the K-Con court was considering: the alleged "futility" of any timely notice by K-Con. See id. at 1010. Given the absence of support for plaintiff's argument in case law or otherwise, the court declines to adopt plaintiff's proffered requirement that, in order to demonstrate prejudice, the government must demonstrate that the steps it could have taken to minimize its liability must have been "wholly within" its control.

The court next turns to the issue of whether the record before this court sufficiently demonstrates that the government was prejudiced by GPNA-K's untimely notice. The government argues that GPNA-K's untimely notice prejudiced the government because it "robbed the United States of the opportunity to address the tax imposition in an appropriate manner, in accordance with well-established policies and procedures." In support of this argument, defendant offers the affidavits of two individuals, Mr. Jamaal Rose, the DLA Energy contracting officer who denied GPNA-K's certified claim, and Ms. Robin L. Johnson, Chief of the International Law Branch of the Office of the Staff Judge Advocate for the United States Central Command (USCENTCOM), as well as a Department of Defense Instruction (DoDI) 5100.64, which defendant claims show the existence of a diplomatic process "specifically designed to address" the sort of tax issues raised in the present case. GPNA-K argues that the sort of lost opportunities alleged by the defendant, as well as certain statements made by Mr. Rose and Ms. Johnson in support of the existence of these opportunities, are too speculative to demonstrate prejudice for the purposes of summary judgment. As an alternative argument, GPNA-K proffers an affidavit from its general director, Mr. Meken Beyshekeev, in order to demonstrate that issues of material fact remain regarding the existence of prejudice.

Looking first at the evidence offered by defendant, Mr. Rose states in his affidavit that he has worked for DLA Energy since July 2008 and as a contracting officer since June 2014, including work on overseas contracts in Afghanistan, Jordan, Iraq, and, for the GPNA-K contracts, in the Kyrgyz Republic. According to Mr. Rose, he "routinely receives inquiries from contractors regarding whether they are required to pay new taxes imposed" by foreign governments. According to Mr. Rose, when contracting officers receive such inquiries, they obtain advice as to whether there is an applicable international agreement and, if there is, they "enlist assistance from the defense attaché assigned to the relevant U.S. Embassy." Mr. Rose states that, in his experience, the "diplomatic process has invariably proved successful." With regard to the present case, Mr. Rose states that, had GPNA-K properly informed DLA Energy in August 2012 that the

Kyrgyz Tax Service had initiated an audit, DLA Energy would have instructed GPNA-K not to pay the taxes and then enlisted diplomatic assistance.[9]

In her affidavit, Ms. Johnson states that she has worked as the Chief of the International Law Branch of USCENTCOM for three and a half years and that her responsibilities include drafting and negotiating international agreements in USCENTCOM's area of responsibility, which includes the Kyrgyz Republic, monitoring compliance with those international agreements, and representing USCENTCOM within the United States government on international law matters. Ms. Johnson describes the diplomatic process that takes place when USCENTCOM becomes aware that a foreign government is attempting to impose taxes in contravention of an international agreement as follows: the relevant contracting officer is advised to advise the contractor not to pay the tax; various officials at USCENTCOM, the relevant United States Embassy, and the United States Department of Defense are apprised of the situation; embassy officials contact local government officials and attempt to convince them to stop the improper charging of taxes; and, if that is unsuccessful, the United States Ambassador, either formally or informally, addresses the matter with the local government. Ms. Johnson states that, in her experience, "it has not been necessary to raise these matters at senior levels of government," presumably because actions at lower levels have proven successful. Ms. Johnson also states that it is "easier to resolve" such tax matters if they are raised as soon as the local government attempts to charge the tax, but that it is "extremely difficult to resolve the matter if the contractor pays the tax and then seeks relief, after the fact." With respect to the present case, Ms. Johnson further states that, had USCENTCOM been informed that the Kyrgyz Republic was charging taxes in violation of the Cooperation Agreement, the matter would have been addressed according to the diplomatic process she described.

DoDI 5100.64, titled "DoD Foreign Tax Relief Program," (March 30, 2006),[10] states: "It is DoD policy to secure, to the maximum extent possible, effective relief from all foreign taxes wherever the ultimate economic burden of those taxes would, in the absence of such relief, be borne by funds appropriated or allocated to the Department of Defense." DoDI 5100.64, para. 4. DoDI 5100.64 does not lay out the process to be used to implement this policy, but instead, among other directions, orders Department of Defense Combatant Commanders to issue procedures for the implementation of the Foreign Tax Relief Program in their areas of responsibility and, where appropriate, designate a liaison to the local United States diplomatic mission and local tax authorities. DoDI 5100.64, para. 5.6. Ms. Johnson states that she is familiar with DoDI 5100.64 and that, in furtherance of the policy it enunciates, the International Law Branch of

[9] The court notes that earlier, on June 20, 2012, the Kyrgyz Tax Service authorized an audit of GPNA-K for compliance with the tax laws of the Kyrgyz Republic, and it was on August 7, 2012 that the Kyrgyz Tax Service issued a decision assessing back profits taxes and penalties against GPNA-K. Moreover, it was not until June 26, 2013 that the Kyrgyz government renounced the Cooperation Agreement, effective July 11, 2014.

[10] Defendant attached a copy of the March 30, 2006 DoDI 5100.64 to its motion for summary judgment.

USCENTCOM works with United States Department of Defense and United States Embassy officials to obtain tax relief consistent with international agreements.

The evidence offered by the government, thus, describes a diplomatic process followed with regularity by the United States government in cases when it receives notice that a contractor working overseas has been taxed by a foreign government in violation of an international agreement. Mr. Rose, based on his experience at DLA Energy, including working as a contracting officer on overseas contracts, and who, eventually, was the contracting officer on the contracts at issue in this case, stated in his affidavit that, in his view, had GPNA-K provided timely notice to DLA Energy of its tax issues, DLA energy would have contacted the appropriate officials in order to commence the diplomatic process, which, in his experience, had "invariably proved successful." Ms. Johnson, who had a number of years of experience working as the Chief of the International Law Branch, USCENTCOM, also stated in her affidavit that, had USCENTCOM been informed of GPNA-K's tax issues, they would have addressed the issues using the outlined diplomatic process. There, therefore, is evidence before the court, in the form of the affidavits of two credible affiants and the Department of Defense Instruction, that GPNA-K's failure to provide timely notice cost the government the opportunity to pursue a diplomatic process with the Kyrgyz government that could have had a substantial chance of helping GPNA-K avoid the imposition of the taxes imposed by the Kyrgyz government. Moreover, since the tax imposition process was initiated in June or August of 2012, before the second contract between DLA Energy and GPNA-K, the 2013 Contract, was signed on March 15, 2013, with prompt notice, the government would have had an opportunity to consider possible added costs of the taxes into the 2013 Contract.

GPNA-K first challenges the sufficiency of this evidence on the grounds that the sort of "lost 'opportunities,' or steps that 'likely' could have been taken" described by the defendant amount to nothing more than speculation, inadequate to demonstrate prejudice. There is, however, no requirement that, in order to prove prejudice, the government must show that the actions which could have been taken by the government would have been certain to have avoided the increased costs. Indeed, the court in Ace Constructors, in a passage quoted prominently by GPNA-K in its briefs, stated that, in order to demonstrate prejudice, the government must only show that, if proper notice had been given, "it might have minimized extra costs." Ace Constructors v. United States, 70 Fed. Cl at 272 (emphasis added). Other decisions of this court, similarly, have found that prejudice existed when a contractor's inadequate notice deprived the government of opportunities that potentially could have minimized extra costs. See Engineered Maint. Servs., Inc. v. United States, 55 Fed. Cl. 637, 643 (2003), aff'd, 89 F. App'x 267 (Fed. Cir. 2004) (holding that the government was prejudiced when a contractor's "insufficient notice directly precluded the Government from investigating the site and potentially minimizing extra costs that the contractor ended up having to incur" (emphasis added) (citing Schnip Bldg. Co., 645 F.2d at 959–60)); George Sollitt Constr. Co. v. United States, 64 Fed. Cl. 229, 291 (2005) ("The Navy has shown that it was prejudiced by the lack of timely notice, because Sollitt's solution for the missing dowels may have been entirely unnecessary, or

a lower cost solution <u>might</u> have been preferred." (emphasis added)).[11] The evidence presented by defendant meets this standard.

GPNA-K next argues that the defendant has not shown that the diplomatic procedures outlined in Mr. Rose's and Ms. Johnson's affidavits, actually, would have served to reduce the defendant's liability due to the unique circumstances of the present case. In particular, GPNA-K argues that, although Mr. Rose stated that he "routinely" received inquiries from contractors regarding the imposition of new taxes by foreign governments, neither Mr. Rose nor the defendant have identified any specific examples of diplomatic procedures working in circumstances such as those in the present case, in which, according to GPNA-K, taxes were imposed as a result of a "shift in policy of the Kyrgyz Republic that ultimately resulted in the formal renunciation of the Cooperation Agreement, and in the Kyrgyz Republic kicking the United States out of the Manas Transit Center." In this regard, the court notes that, in this statement, the plaintiff also acknowledges that the Cooperation Agreement was renounced only after the Krygyz Tax Service had imposed the back taxes at issue. GPNA-K claims that this alleged "shift in Kyrgyz policies over the 2011-2014 period is well documented," pointing to a <u>New York Times</u> article from November 1, 2011, which reported that the newly elected president of the Kyrgyz Republic had made a statement "threat[ening]" to close the Manas Transit Center when the United States' lease ran out in 2014 because the base could "become a security risk for his country."[12] <u>See</u> Michael Shwirz, <u>New Leader says U.S. Base in</u>

---

[11] Both parties cite a number of allegedly analogous insurance cases in support of their arguments that the government's lost opportunities were or were not speculative. The court, however, finds that the cases cited above regarding prejudice, which are based on a section of the FAR, FAR § 52.236–2, with a very similar notice provision to the one at issue in the present case, are far more persuasive than the insurance cases offered by both parties, which are based on doctrines of state insurance laws that, as GPNA-K indicates in its reply brief, have evolved over time and can differ substantially from state to state.

[12] In support of its contention that the shift in Kyrgyz policy is "well documented," GPNA-K also cites an eleven page report written by Vincent Artman, a graduate student at the University of Oregon, on the history of the Manas Transit Center and its place in Kyrgyz politics. <u>See</u> Vincent M. Artman, <u>The American Transit Center at Manas: What Drives Kyrgyz Policy?</u>, http://fmso.leavenworth.army.mil/collaboration/universities/kyrgyz-policy.pdf (last visited May 9, 2017). Although GPNA-K cites the Artman authored report as being published by the United States Army, Foreign Military Studies Office (FMSO), the report itself is not labelled as such and is posted on the FMSO's website as a "Featured University Research Collaboration." <u>See</u> U.S. Army, Foreign Military Studies Office, http://fmso.leavenworth.army.mil (last visited May 9, 2017). Additionally, although GPNA-K lists the report as being from 2013, the report itself is undated and no date is listed on FMSO's website. The court, thus, has serious concerns about the evidentiary value of the Artman authored report. Moreover, the report itself adds little relevant information to the <u>New York Times</u>'s characterizations of the Kyrgyz government's attitude toward the Manas Transit base, stating that President Atambayev "remain[ed] opposed to a continued American military presence at Manas." <u>See</u> Artman at 8.

Kyrgyzstan Will Be Shut, N.Y. Times, November 1, 2011, at A6. The court initially notes that, although it is undisputed that, in June 2013, the Kyrgyz Republic passed a law denouncing the Cooperation Agreement, effective July 11, 2014, and that the United States ultimately handed over control of the Manas Transit Center to the Kyrgyz Republic in June 2014, there is nothing in the record that supports GPNA-K's assertion that the "Kyrgyz Republic kick[ed] the United States out of the Manas Transit Center." Nor are the conclusions in the New York Times article cited by GPNA-K properly documented. Indeed, the favorable statements GPNA-K sought, and received, from various high placed Kyrgyz authorities, including the Deputy Minister of Foreign Affairs, the Minister of Economy and Antimonopoly Policy, and the Prime Minister, all occurred after the election of the new Kyrgyz President in November 2011, when the plaintiff apparently alleges the "shift" in Kyrgyz polices towards the United States began, demonstrate that the relationship between the United States and the Kyrgyz Republic during the period at issue was more complex than GPNA-K alleges. Even setting aside the question of the evidentiary value of a single newspaper article, GPNA-K has failed to offer reliable, sufficient evidence to demonstrate that its case was any different in character from those involving the imposition of the foreign taxes Mr. Rose describes in his affidavit as having been successfully resolved by the United States government's diplomatic process.

GPNA-K additionally argues that it is not "plausible" that the United States government would, as Mr. Rose states in his affidavit, have directed GPNA-K not to pay the taxes sought by the Kyrgyz government because GPNA-K allegedly could not have delayed paying the taxes any longer than it did without the Kyrgyz Tax Service unilaterally exercising its legal offset rights, GPNA-K allegedly "vigorously pursued relief" with the Kyrgyz Tax Service and the Kyrgyz courts both before and after the taxes were paid, and any additional non-payment by GPNA-K would allegedly have resulted in escalating penalties from the Kyrgyz Tax Service. GPNA-K, however, misunderstands the significance of Mr. Rose's statement. Mr. Rose stated that, had GPNA-K informed DLA Energy of the imposition of the taxes at issue "in August 2012" (or, presumably, earlier), DLA Energy would have directed GPNA-K not to pay the taxes and then enlisted the assistance of the defense attaché at the United States Embassy in Kyrgyzstan "to resolve the issue through diplomatic channels." Ms. Johnson, in turn, testified that "[i]t is easier to resolve" tax matters if they are raised to the contracting officer as soon as the local government attempts to impose them, but that "[i]t is extremely difficult to resolve" such tax matters through the diplomatic process after a contractor has paid the tax. The significance of this combined testimony is not, as GPNA-K argues, that, had GPNA-K provided the government with more timely notice, then the government would have urged GPNA-K to continue to avoid paying that taxes at issue longer than it ultimately did, or that the United States government, rather than GPNA-K, would have pursued the same course GPNA-K did with the Kyrgyz Tax Service and in the Kyrgyz legal system. Instead, it is that, had GPNA-K promptly notified the contracting officer prior to appealing, litigating, and, ultimately, paying the taxes assessed by the Kyrgyz Tax Service, the United States government would have had a better chance of favorably resolving the imposition of the taxes at issue with the Kyrgyz government via the diplomatic process described by Ms. Johnson. Ms. Johnson would have had experience with the successful implementation of this process in her position as the Chief of the International Law branch at USCENTCOM, in which capacity she oversaw compliance with international agreements such as the

United State/Kyrgyz Republic Cooperation Agreement. Thus, the statement in Mr. Rose's affidavit that, had he received notice of GPNA-K's tax issues in August 2012, he would have instructed GPNA-K not to pay the taxes is not only plausible but consistent with the process the evidence shows the United States government would have undertaken had the defendant received prompt notice, just as it routinely had done so successfully in the past.

Finally, GPNA-K proffers an affidavit from its general director, Mr. Meken Beyshekeev, in an attempt to show that, even if GPNA-K has failed to demonstrate that summary judgment in its favor is appropriate, "the notice and prejudice issues are genuinely disputed issues of fact, precluding judgment in the government's favor." In his affidavit, Mr. Beyshekeev states that he is currently the general director of GPNA-K and that, from 2009 to 2015, he was its deputy general director responsible for sales. The testimony in Mr. Beyshekeev's affidavit consists largely of a description of GPNA-K's reasons for paying the taxes assessed by the Kyrgyz Tax Service and an accounting of the various taxes and penalties paid by GPNA-K. Relevant to the issue of prejudice, Mr. Beyshekeev states that "nothing would have been different if DLA Energy had been formally informed by GPNA-K of all communications and facts regarding the positions of the Kyrgyz Tax Service and courts, immediately as those events occurred." In support of this assertion, Mr. Beyshekeev offers only the following statements, quoted in full:

> 18. There is nothing that the United States Government could have done in October of 2011, or thereafter, that would have avoided or changed the results eventually reached by the Kyrgyz Tax Authorities and courts with regard to the profits taxes. The U.S. Government could not have marshalled more or better evidence than GPNA-K did, and the U.S. Government would have had no right to intervene as a party in the Kyrgyz legal proceedings. Especially in light of the eventual determinations by the Kyrgyz Republic to renounce the Cooperation Agreement and to take back control of the Manas Transit Center, and the general shift of position of Kyrgyz authorities away from economic concessions or benefits to the United States during the period after 2011, there is no basis for the U.S. Government to correctly contend that it could have taken any steps to change the tax results.

> 19. Similarly, there is nothing else, beyond what GPNA-K already did, that the U.S. Government could have directed GPNA-K to do that would have avoided, or reduced, the taxes. GPNA-K disputed the taxes promptly and appropriately, including taking the issues all of the way to the Kyrgyz Supreme Court. When it was sensible to curtail such challenges in order to reduce the overall penalties, GPNA-K reasonably did so.

The defendant does not question that GPNA-K acted appropriately in attempting to challenge the imposition of the taxes administratively and in litigation, or that the United States government would have acted differently had it even been able to take part in such administrative and legal challenges. Instead, defendant argues that, had it been given prompt notice of the taxes at issue, it could have pursued a diplomatic process that could

have had a substantial likelihood of success. Mr. Beyshekeev's statement's related to prejudice amount to speculation regarding what the government of the United States could or could not have done or attempted to do had it been promptly informed of the GPNA-K's tax issues, either on June 20, 2012 when the Kyrgyz Tax Service authorized an audit of GPNA-K's compliance with the tax laws of the Kyrgyz Republic or on August 7, 2012, when the Kyrgyz Tax Service issued a tax assessment with penalties against GPNA-K. In making these statements, Mr. Beyshekeev does not discuss the suggested diplomatic process discussed in the affidavits of Mr. Rose and Ms. Johnson. Instead, Mr. Beyshekeev's affidavit refers to uncontested facts regarding GPNA-K's actions in challenging the Kyrgyz Tax Services assessments, and notes, without elaboration or corroboration, that there was a "general shift of position of Kyrgyz authorities away from economic concessions or benefits to the United States during the period after 2011." Mr. Beyshekeev's conclusions that "there is no basis for the U.S. Government to correctly contend that it could have taken any steps to change the tax results" and that "there is nothing else, beyond what GPNA-K already did, that the U.S. Government could have directed GPNA-K to do that would have avoided, or reduced, the taxes" do not address defendant's position that had it been given prompt notice of the actions of the Kyrgyz government regarding the imposition of taxes on GPNA-K, the United States government could have initiated diplomatic actions to address the taxing decisions by the Kyrgyz government, as described by defendant in their submitted declarations. Therefore, GPNA-K has failed to controvert the prejudice established by the defendant in its filings submitted to the court.[13]

## CONCLUSION

The taxes at issue paid by GPNA-K were exempt from taxation under the terms of the Cooperation Agreement, and, therefore, they became reimbursable under the 2011 and 2013 Contracts. Defendant, however, has offered sufficient evidence to demonstrate that plaintiff GPNA-K failed to provide the prompt notice required by the FAR provision included in the 2011 and 2013 Contracts of actions taken by the Kyrgyz government, including by the Kyrgyz Tax Service, that, reasonably, could have been expected to result in the imposition of taxes on GPNA-K in violation of the Cooperation Agreement in a manner that could result in upward contract price adjustments. Defendant also has offered sufficient evidence to demonstrate that the failure to promptly notify defendant resulted in prejudice to the defendant. GPNA-K, therefore, is barred from recovering the

---

[13] Defendant makes two additional arguments that the court need not discuss because it finds that defendant has shown sufficient prejudice resulting from GPNA-K's failure to promptly fulfill its obligations under FAR § 52.229-6(j). First, defendant argues that GPNA-K's untimely notice also violated GPNA-K's obligation under FAR § 52.229-6(i), which was also quoted in full in the contracts at issue, to "take all reasonable action to obtain exemption from or refund of any taxes or duties, . . . which the governments of the United States and of the country concerned have agreed shall not be applicable to expenditures in such country by or on behalf of the United States." FAR § 52.229-6(i) (June 2003). Defendant also argues that a decision of this court agreeing with GPNA-K regarding the futility of any diplomatic engagement by the United States with the Kyrgyz government "may raise a nonjusticiable political question."

amount of those taxes under the 2011 and 2013 Contracts. Plaintiff's motion for summary judgment is **DENIED**. Defendant's motion for summary judgment is **GRANTED**. Plaintiff's complaint is **DISMISSED**. The clerk shall enter **JUDGMENT** consistent with this opinion.

**IT IS SO ORDERED.**

s/Marian Blank Horn
**MARIAN BLANK HORN**
**Judge**